UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARON JONES, | Case No. 18-cv-01857-WHO |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| NANCY A. BERRYHILL, | |
| Defendant. | Re: Dkt. Nos. 19, 20 |

The parties have filed cross-motions for summary judgment in this Social Security appeal. Based upon my review of the parties' papers and the administrative record, I GRANT plaintiff's motion, DENY defendant's motion, and the matter is remanded for further proceedings.

**BACKGROUND**

I. **PROCEDURAL HISTORY**

On February 6, 2014, plaintiff Sharon Jones applied for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, alleging a disability onset date of June 15, 2010. Administrative Record ("AR") 262. Her application was denied initially and again on reconsideration. AR 185–89, 194–98. She requested a hearing and appeared with counsel before Administrative Law Judge ("ALJ") Evangelina P. Hernandez on June 28, 2016. AR 98–131. On September 12, 2016, the ALJ denied her claim for benefits. AR 10–27. On November 4, 2016, Jones appealed. AR 258. The ALJ's September 2016 denial became the Commissioner's final decision when the Appeals Counsel declined review on January 24, 2018. AR 1–4. On March 27, 2018, Jones filed this action for judicial review pursuant to 42 U.S.C. § 405(g). Dkt. No. 1. Jones filed a motion for summary judgment on November 21, 2018, and the Commissioner filed a cross-motion for summary judgment on December 19, 2018. Dkt. Nos. 19, 20.

On June 17, 2019, Jones filed a request for judicial notice of a Notice of Award dated May 28, 2019, from the Social Security Administration.[1] Dkt. No. 24. After the adverse decision from ALJ Hernandez, Jones filed a subsequent application for SSI benefits. That subsequent application ended up with a decision that Jones was entitled to SSI benefits as of November 2016 "based on being disabled." *Id*. Therefore, the only time period covered by this appeal is whether plaintiff was disabled and entitled to benefits between June 15, 2010 and October 2016.

## II.    JONES'S IMPAIRMENTS

### A.    Physical Impairments

On October 4, 2011, Dr. Sokley Khoi, a psychologist who was not performing a physical examination or an eye test, noted that Jones "walked slowly" and had "difficulty with visual tasks." AR 405. On October 24, 2011, at the request of the Social Security Administration, Jones was examined by Dr. Farah M. Rana. AR 409. Dr. Rana reported that although Jones was uncooperative during her vision testing, which was not completed, she was able to walk around the examination room without problem and could fill out part of the information sheet. AR 410. Dr. Rana noted that on her previous test Jones's vision was 20/70 on the right and 20/100 on the left. AR 411. While Jones reported tenderness in her upper chest, there was no lower back tenderness noted and she had the full range of motion for all of her joints. AR 410. Dr. Rana concluded that Jones did not have any sitting, standing, walking, weight carrying, or postural limitations. AR 411.

In April 2014, Jones was examined Dr. Manuel Hernandez. AR 592. In his notes, Dr. Hernandez reported that Jones's right eye vision was 20/30 and that she could not see out of the center part of her left eye. AR 593. He noted that in 2011 while Jones complained of blurry vision, she did not report being unable to see out of the center part of her eye. AR 593. Dr. Hernandez reported that Jones was able to fill out the intake form without problem and was able to walk around the room. AR 593. She was also able to get on and off the exam table without issue.

---

[1] The Commissioner has not opposed the request for judicial notice. I GRANT the request. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned.").

1    AR 594.  Based on his observations, Dr. Hernandez found that Jones had no exertional, sitting, or

2    standing limitations.  AR 596.

3         In a May 2014 Disability Determination Explanation, state physician I. Newton MD

4    reviewed Jones's medical records and found Jones's symptoms to be "nonsevere" without

5    explaining why.  AR 158.  After Jones requested reconsideration of her initial denial of benefits,

6    Dr. Joan Bradus, MD conducted a second review of Jones's medical records in October 2014.  AR

7    173, 176–77.  Bradus determined that Jones's near acuity was limited in her left eye, her far acuity

8    was limited in both eyes, her field of vision was limited, and she was blind in her left eye.  AR

9    176–77.  She opined that Jones was still able to do jobs that did not require fine discrimination at a

10   distance or constant use of eyes for close work.  AR 176–77.  She also noted that Jones should

11   "[a]void even moderate exposure" to hazards such as machinery and heights.  AR 177.

12        Dr. Matthew Fentress, Jones's treating physician, examined Jones on four occasions:

13   December 14, 2015; December 21, 2015; February 23, 2016; and March 24, 2016.  AR 790, 787,

14   769, 814.  On her first visit, Jones reported pain and numbness in her feet, blindness in her left

15   eye, blurriness in her right eye, and low back pain.  AR 790.  Dr. Fentress assessed Jones as

16   having "[l]ow back pain without sciatica, unspecified back pain laterality," and suspected

17   "peripheral polyneuropathy."  AR 792.  He recommended that Jones increase her daily gabapentin

18   dosage from one tablet in the morning, afternoon, and evening, to one in the morning and

19   afternoon and two in the evening.  AR 792.

20        On December 21, Dr. Fentress noted that Jones's foot pain improved after he increased her

21   dosage of gabapentin and that there had been no recent change in her vision.  AR 787.  At this

22   visit, Dr. Fentress diagnosed her with peripheral polyneuropathy and chronic vision loss in her left

23   eye.  AR 789.  He also referred her to Optometry.  AR 789.

24        Dr. Fentress examined Jones's vision during the February 23, 2016 visit.  He noted that

25   Jones experienced blurriness in her right eye one to two times per week, "especially when she

26   goes outside," and that she had permanent vision loss in her left eye, but that she was able to read

27   a digital clock from across the room.  AR 769.  On her last visit to Dr. Fentress, Jones complained

28   about  nausea and poor appetite, and she "[reported] ongoing pain, throbbing, pins and needles

3

feeling in glove and stocking distribution." AR 814. Jones had noted that gabapentin was helping but she had run out of them. *Id*. Fentress re-prescribed her with gabapentin at this visit. AR 817.

Dr. Fentress completed a Physical Medical Source Statement on June 23, 2016. AR 821-824. He listed Jones's physical diagnoses as peripheral neuropathy, permanent visual loss left eye, low back pain, and major depressive disorder. AR 821. He estimated that Jones could walk only two city blocks without rest or severe pain, could not sit for more than two hours at a time, could not stand for more than two hours at a time, and could sit and stand/walk for at least six hours during an eight-hour work day. AR 822. Dr. Fentress stated that Jones's pain or numbness would cause her to take two to three unscheduled breaks during a workday, she would need to rest 20 minutes before returning to work, and she would likely be absent more than four days per month. AR 822, 824. Fentress noted that Jones's psychological limitations (discussed below) are more significant and limiting than her physical limitations. AR 824.

Dr. Andrea De Souza, O.D. examined Jones on May 20, 2016, and completed a Vision Impairment Medical Source Statement the same day. AR 801. She listed Jones's diagnoses as "macular scar of left eye and decrease vision of right eye of unknown etiology" and listed Jones's visual acuity after best correction as 20/60 in her right eye and 20/HM in her left. AR 801. Dr. De Souza opined that Jones was not capable of avoiding ordinary hazards in the workplace, such as boxes on the floor, and that she had difficulty walking up or down stairs. AR 802. She stated that Jones would "rarely" be able to lift less than ten pounds. AR 802. While Dr. De Souza did not think Jones would need to take unscheduled breaks during an eight-hour work day, she did estimate that Jones would spend more than 25% of the work day "off task" because of her symptoms. AR 803.

When Jones applied for SSI in 2014, she alleged a disability onset date of June 15, 2010. AR 262. Her reported physical impairments at the time were back pain and central eye blindness. AR 607. Jones's medical records do not state the cause of these impairments, though at her hearing she speculated that her back pain may have begun after falling down a hill when she worked as a construction worker. AR 116. In her Function Report, Jones claimed that she could not "stand for a long period of time" and that she could not see out of her left eye. AR 327. She

4

stated that her pain affected her ability to sleep, cook for herself, and walk. AR 328–29, 332. After her initial application was denied, Jones appealed the decision and claimed that her vision had worsened and that her back pain had spread down to her ankle, affecting her ability to move, walk, and see. AR 351–52, 355.

At her hearing in front of the ALJ on June 28, 2016, Jones testified that she cannot see out of her left eye and that her vision in her right eye sometimes "gets to the point where it gets so blurry" that she cannot see out of it. AR 104–05. The last time she experienced this blurriness had been the night before the hearing, when she could not see anything "for minutes." AR 105. Jones also testified that she had ongoing pain in her back, in her buttocks, and in her feet, but that if she took medication for the pain, she was able to walk around. AR 105, 111–12, 113–14. Jones guessed that she would be able to carry a bag of groceries, weighing five or ten pounds, from the car to her apartment with one of her hands, but not the other because she was afraid of the veins in her other wrist popping out. AR 118. She speculated that she would be able to make multiple trips between the car and her apartment if her feet were not hurting her, but could not lift more than ten pounds because her back might go out. AR 118–19. Jones testified that the pain in her feet made her fall "quite a few times" in the last month and that she uses a cane for balance. AR 124.

**B.    Mental Impairments**

In 2011, Jones was examined by Dr. Sokley Khoi at the request of the Social Services Administration. AR 404–08. Dr. Khoi's notes from this evaluation indicate that Jones was cooperative; oriented to person, time, and situation; and "had no obvious speech articulation or language comprehension difficulties." AR 405. Her mood was depressed and at times during the examination she appeared tearful. AR 405. Dr. Khoi noted that Jones tested as either "extremely low" or "borderline" on the WAIS-IV and WMS-IV tests he conducted, and tested as a low level of ability on the Bender-Gestalt test.[2] AR 405–06. After completing a series of tests, Dr. Khoi

---

[2] "The Wechsler Adult Intelligence Scale, Fourth Edition is designed to assess cognitive functioning with specific subtests focused on memory, knowledge, problem solving, calculation, abstract thinking, spatial orientation, planning, and speed of mental processing." AR 601. The WMS-IV and WMS-IV (LMVR) measure memory and the Bender Gestalt II measures visual

concluded that Jones appeared to be "experiencing significant symptoms of depression." AR 406.

He noted that she would likely have marked impairments in the following work-related abilities:

ability to understand and remember detailed instructions, ability to carry out detailed instructions,

ability to maintain adequate pace and persistence to perform complex/detailed tasks, ability to

adapt to changes in job routine, ability to withstand the stress of a routine work day, and ability to

interact appropriately with co-workers, supervisors, and the public on a regular basis. AR 407.

He also noted that she would have moderate difficulties with her ability to carry out short and

simple instructions and her ability to maintain adequate pace and persistence to perform simple

tasks. AR 407. In addition, he reported that Jones would have mild to moderate difficulties with

her ability to understand and remember short and simple instructions. AR 407. He concluded that

although she had alcohol dependency issues, she would continue to have these impairments even

without substance abuse. AR 407.

On August 22, 2012, Jones was examined by a psychiatrist at the Sausal Creek Outpatient

Stabilization Clinic. AR 413–26. Jones came to the clinic because her father had passed away a

few days prior and she had begun hearing voices daily. AR 414. She also reported that after her

husband died in 2005, "everything fell apart" and she became homeless. AR 414. At this

assessment, the nurse noted that Jones had never been prescribed psychiatric medications before.

AR 415. The psychiatrist documented her history of suicide attempts; once by drinking bleach

and the other by drinking ammonia. AR 422. The psychiatrist assigned Jones a Global

Assessment of Functioning ("GAF") score of 40 and prescribed her medication.[3] AR 423.

On the same day, Sausal Creek referred Jones to the Alameda County Medical Center to

assess her for "suicidality" and to make prescription recommendations. AR 742. Milton Lorig,

M.D. examined her and noted her depressed mood, poor appetite, and thoughts of suicide. AR

---

motor abilities. AR 404–05.

[3] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). "[A] GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'" *Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014) (quoting Diagnostic and Statistical Manual of Mental Disorders, 4th ed.)

6

742.  Dr. Lorig found that Sausal Creek's recommended psychiatric medication regimen did not "adequately address" her symptoms and prescribed other medication.  AR 742.  He diagnosed her with "Major Depressive Disorder, Single Episode, Unspecified" and noted her admission GAF as 45.  AR 743.

In December 2012, Jones was examined by LCSW Rudolph C. Smith at the Save a Life Wellness Center.  He noted that Jones had marked limitations in the following areas:  ability to remember work-like procedures, ability to maintain attention for extended periods, ability to maintain regular attendance and be punctual within customary tolerances, ability to sustain ordinary routine without special supervision, ability to work in coordination with others without being unduly distracted by them, ability to make work-related decisions, ability to complete a normal workday and work-week without interruptions from psychologically based symptoms and to perform consistent pace without an unreasonable number and length of rest periods, ability to accept instructions and respond appropriately to criticism from supervisors, ability to get along with co-workers and peers without unduly distracting them or exhibiting behavioral extremes, and ability to respond appropriately to changes in a routine work setting.  AR 638.  Smith opined that Jones's mental health impairments would prevent her from working and that she should also be referred for a physical examination because of her lumbar problems.  AR 639.

Jones was examined by Dr. Aliyeh Kohbod on three occasions in 2014, after she was referred by an advocacy specialist at the Mental Health Association of Alameda County to determine her eligibility for disability benefits.  AR 598.  Dr. Kohbod noted that while records from Jones's hospital stays did not reference her mental health issues, she had been assessed in 2012 at an outpatient facility after hearing voices, where she was given the diagnosis of "Psychotic Disorder NOS" (Not Otherwise Stated) and "Mood Disorder NOS."  AR 599.  She pointed out that these notes were "not made by psychiatric professionals," and that later notes "indicate the presence of auditory and visual hallucinations."  AR 605.  Dr. Kohbod concluded that Jones's symptoms met the criteria of Schizophrenia, paranoid type and that this psychosis would likely prevent her from engaging in meaningful employment unless her current symptoms could be "controlled through psychotropic medication and extensive rehabilitative therapy."  AR 606.

In June 2014, an SSA psychological and medical consultant, Heather Barrons, Psy. D, reviewed Jones's medical records. AR 151–65. Dr. Barrons stated that as of June 2014, Jones had "no [psychiatric] hospitalizations and minimal [psychiatric therapy]," though Dr. Barrons also noted that there were two complete psychiatric evaluations in Jones's file, one from 2011 and one from 2014. AR 159. She opined that Jones's symptoms moderately restricted her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, and pace. AR 159. She found Dr. Kohbod's assessment of Jones to be not supported by the "overall [evidence] in file" and assigned great weight to Dr. Hernandez's assessment of her physical abilities. AR 160. She determined that Jones was not disabled and was capable of maintaining concentration, pace, and persistence for simple routines throughout a normal workday and week. AR 162, 165.

After Jones requested reconsideration of her initial denial, Dr. Lucila, MD reviewed her medical records in October 2014. AR 167–82. Dr. Lucila affirmed Dr. Barrons's initial findings (AR 174) and found that Jones would be able to "understand and perform simple one-two step instructions," "maintain adequate attention, concentration, persistence, and pace to perform routine tasks," and "interact appropriately with supervisors, co-workers, and the public on a limited basis." AR 179.

On December 1, 2015, James M. Relchmuth, M.D. and another health care provider examined Jones and prescribed her with Risperdal to treat her psychosis. AR 755–67. He listed her relevant past psychiatric history as two hospitalizations (at least one of which was in 2012) and two suicide attempts, both followed by hospitalizations. AR 757. Her recorded symptoms included hearing voices, low appetite, and sleep problems. AR 759. The other mental health care provider speculated that Jones was suffering from psychosis. AR 759. Dr. Relchmuth assigned Jones a GAF score of 45. AR 758. The other health care provider assigned her a risk assessment score of 86 for "serious self-neglect." AR 761.

At the end of 2015, Jones began receiving treatment for her physical and mental impairments at Lifelong Trust Health Center. AR 769–830. She received treatment from Dr. Matthew Fentress and Shana Green, a Nurse Practitioner. Green examined Jones on four

8

occasions in 2016, after Dr. Fentress referred her for a psychiatric assessment (AR 781): January

4, February 5, February 23, and March 22. AR 781, 777, 772, 810. At the initial visit, Jones

reported to Green that she had been hearing voices, experiencing thoughts of suicide, having

trouble sleeping, and experiencing a loss of appetite. AR 781–82. Green's notes document

Jones's history of trauma, including sexual abuse as a child (AR 782), physical abuse from her

mother (AR 782), and a suicide attempt (AR 783). In their conversations, Green noted that Jones

forgot her thoughts mid-sentence and that her recent and remote memory was inconsistent. AR

784. Green advised that Jones maintain taking Risperidone and start attending therapy. AR 785.

The second time Green assessed Jones, she noted that Jones had "multiple no

shows/cancellations," that Jones attributed to having difficulties with transportation, forgetfulness,

and her fear of leaving the house. AR 777–78. Jones stated that her fear of leaving the house

came from what might happen if she suddenly lost sight. AR 778. She characterized driving a car

as "always difficult," and that she drove with her friend John sometimes, but panics when she

does. AR 778. She also found it difficult to take the bus because of her difficulty being in crowds

due to her eyesight. AR 778. Jones reported that the Risperidone stopped her from hearing voices

and that she was able to sleep without leaving the television on to drown out the voices. AR 778.

However, Jones still reported thoughts of suicide, low mood, and low appetite. AR 778.

At her third appointment, Jones reported her situation was "a little better," her appetite was

still poor, she was still experiencing suicidal thoughts, and had low energy and motivation. AR

773. Green noted that Jones's concentration and focus had improved, that her judgment had

improved, and that her recent and remote memory was average. AR 773–74. At this appointment,

Dr. Fentress prescribed Jones with Cymbalta, after Green recommended it. AR 770, 780.

During the fourth appointment, though she was taking Risperidone and Cymbalta, Jones

continued to report feeling depressed, experiencing "high anxiety," having difficulty leaving her

home, and having suicidal thoughts. AR 811. When Jones visited Dr. Fentress on March 24, he

observed that she was "very anxious," "easily excitable," "tearful and despondent about her life,"

and became fixated on the idea that she might have cancer. AR 814. He diagnosed her with

9

"episode of recurrent major depressive disorder" and prescribed her with an albuterol inhaler.[4]
AR 816–17.

In his June 23, 2016 Physical Medical Source Statement, Dr. Fentress identified "major depressive disorder" as Jones's mental diagnosis. AR 821–24. He stated that emotional factors contributed to the severity of Jones's symptoms and functional limitations. AR 821. At the end of the assessment, he wrote, "The patient's psychological limitations are more significant than her physical limitations. Her functional impairments in attention and concentration related history of trauma and depression will make it very difficult or impossible for her to maintain regular employment." AR 824. Because of her "mental status, disorganized state, and inability to regularly follow through with appointments and other instructions," Dr. Fentress estimated that she was incapable of even low stress work and was likely to spend 20% of the workday off-task. AR 824.

In her application for SSI, Jones reported mental impairments of depression and anxiety with schizophrenia. AR 607. She claimed that because of her anxiety, she got "scared and nervous" around people. AR 327. She reported that she watched television all day long because she was "scared to go outside." AR 328. When her initial application was denied, Jones appealed the decision, arguing that her mental health conditions had not improved since her initial application and she still suffered from schizophrenia and anxiety. AR 350. She also claimed that she heard voices if she did not take medication and kept the television on so that she did not hear them. AR 351.

At the ALJ hearing, Jones testified that she does not think she would be able to return to work because she does not know whether her "feet might go out or [her] eye sight might go," which gives her anxiety. AR 104. The unpredictable blurriness of her right eye makes her "scared and nervous." AR 104–05. She testified that she is scared to go out by herself, that during the day she watches television, and makes Hungry-Man meals for herself in the microwave. AR 104–05,

---

[4] Jones reported to Maria Aguilar at Highland Wellness in September 2015 that she has "frequent, often once-daily anxiety attacks" that she treats with an albuterol inhaler. AR 668. However, Dr. Aguilar conducted a pulmonary function test and found that it was normal, indicating that Jones does not have asthma. *Id.*

108.  She reported that she often experiences low appetite and if she tries to eat during these

periods, "[i]t's like [the food] gets struck in [her] throat."  AR 108.  Jones testified that on the day

of her hearing, it had been four days since she last ate, when her niece came to visit her.  AR 108–

09.  Though her niece had come to visit her, Jones stated that "people rarely come over."  AR 110.

Since starting to take medication in 2015, Jones stopped hearing voices and was able to

sleep in silence, but still could not sleep through the night.  AR 111, 758.  She reported that she

sometimes forgets to take her medication, but remembers if her feet and back start hurting.  AR

111–12.  Jones also testified that she has trouble remembering her appointments and does not go

anywhere by herself.  AR 112.  She discussed feeling depressed, having good days and bad days,

and that her anxiety was better now that she was taking medication.  AR 117, 121.

### III.  JONES'S ACTIVITIES OF DAILY LIVING

Jones has testified to a limited set of daily life activities.  She has stated that she spends the

majority of her time alone in her apartment, watching television.  AR 108, 328.  She does not go

out alone because she is scared to go outside.  AR 330.  The only places she reports going on a

regular basis are the store, where she goes shopping once a month, and her doctors appointments.

AR 330–31.  The only "housework" she reports doing is "[making]" the couch she sleeps on,

which she estimates takes ten minutes.  AR 329.  She uses a microwave to prepare her meals

because she "can't stand long" enough to cook other food.  AR 329.  However, most days Jones

has little interest in eating, needs reminders to eat, or does not eat at all.  *See* AR 108, 329.  While

Jones has testified to receiving visits from her niece and visiting her daughter in Sacramento, she

has stated that she spends most of her time alone.

### IV.  THE ALJ'S DECISION

On September 12, 2016, the ALJ rendered a decision finding that Jones has not been under

a disability as of her application date, January 22, 2014.  AR 13.  The ALJ decided that Jones had

a number of severe impairments:  alcohol abuse, anxiety disorder, major depressive disorder, loss

of vision, peripheral neuropathy, and schizophrenia, but after considering three separate medical

listings, held that Jones's impairments did not satisfy their criteria.  AR 15–17.

At step one, the ALJ determined that Jones has not engaged in substantial gainful

11

1  employment since her application date.  AR 15.  At step two, the ALJ determined that Jones has

2  the following severe impairments:  alcohol abuse, anxiety disorder, major depressive disorder, loss

3  of vision, peripheral neuropathy, and schizophrenia, paranoid type.  AR 15.  The ALJ also

4  determined that Jones has non-severe impairments as well, such as back pain and ankle pain, but

5  because there was evidence in the record Jones had a "normal back with a normal range of

6  motion" and "normal extremities," these impairments did not more than minimally affect her

7  ability to perform basic work activities.  AR 15–16.  The ALJ noted that, nevertheless, she would

8  account "for all impairments in the residual functional capacity, as necessary, taking into account

9  the totality of the record."  AR 16.

10  At step three, the ALJ found that Jones did not suffer from an impairment or combination

11  of impairments that met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

12  Appendix 1.  AR 16.  The ALJ specifically considered listings 11.14 (peripheral neuropathy), 2.02

13  (loss of central visual acuity), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety

14  and obsessive-compulsive disorders).  AR 16–17; 20 C.F.R. Part 404, Subpart P, Appendix 1.

15  The ALJ found 11.14 was not met because she found Jones did not demonstrate

16  "significant and persistent disorganization of motor function in two extremities resulting in

17  sustained disturbance of gross and dexterous movements, or gait and station."  AR 16.  The ALJ

18  rejected 2.02 because "the claimant's corrected vision in the better eye is 20/50." [5]  AR 16.

19  When determining whether Jones's impairments medically equaled listings 12.04 and

20  12.06, the ALJ considered whether the "paragraph B" criteria were satisfied.  AR 17.  To satisfy

21  these criteria, the mental impairments must result in at least two of the following:  marked

22  restriction of activities of daily living; marked difficulties in maintaining social functioning;

23  marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of

24  decompensation.  AR 17.  The ALJ found that Jones had mild restriction of activities of daily

25  living because she was able to prepare her own meals, watch television, be by herself most of the

26  time, "make her couch, which she sleeps in," and drive.  AR 17.  Because the ALJ found that

27

28  _____
[5] Listing 2.02 requires remaining vision in the better eye after best correction to be 20/200 or less.
20 CFR Part 404, Subpart P, Appendix 1.

12

Jones was able to go shopping for food, use public transportation, live in an apartment with a friend, spend time with her niece, and visited her daughter in Sacramento, the ALJ assessed that Jones had only moderate difficulties in maintaining social functioning. AR 17. The ALJ concluded that Jones had only moderate difficulties in concentration, persistence, or pace because she was able to use public transportation to travel, pay bills, count change, and watch television. AR 17. Finally, the ALJ noted that Jones has not experienced any episodes of decompensation. AR 17.

Prior to step four, the ALJ determined that Jones had the RFC to "perform medium work as defined in 20 C.F.R. 419.967(c) with the following limitations: never climb ladders, ropes, or scaffolds; kneeling and crawling would be occasional; has to avoid concentrated use of hazardous machinery and concentrated exposure to unprotected heights; limited to occupations that do not require complex written or verbal communication; work is limited to simple as defined in DOT as SVP levels 1 and 2, routine and repetitive; can work in a low stress job defined as having only occasional decision making and only occasional changes in the work setting; can have only occasional interaction with the general public; and only occasional interaction with co-workers."[6] AR 18.

In making this assessment, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including opinion evidence. AR 18. The ALJ noted that Jones's medical records reflected physical diagnoses of loss of vision in the left eye, reduced vision in the right eye, and peripheral neuropathy, and mental diagnoses of major depressive disorder, anxiety, and schizophrenia, paranoid type. AR 19.

The ALJ considered Jones's symptoms and found that her medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that Jones's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence" in the record. AR 20.

---

[6] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c).

The ALJ first found that Jones had "described activities of daily living that are not as limited as one would expect given [her] complaints of disabling symptoms and limitations." AR 20. In particular, the ALJ found that Jones's allegation that she was too afraid to go outside and spends most of her time alone was inconsistent with her activities of daily living because Jones went outside for walks, received "frequent" visits from her niece, and was able to visit her daughter in Sacramento. AR 20. The ALJ also noted that Jones "reported being able to go shopping in stores, being able to prepare her own meals, being able to drive a car, and spending her days watching television." AR 20. Because driving involves constant and complex coordination and driving and watching television "require[] good visual abilities," the ALJ determined that these activities were inconsistent with the alleged severity of Jones's impairments. AR 20.

Next, the ALJ determined that there was "evidence in the record that [Jones] had not been entirely compliant in taking her prescribed medications," and that "the record reflects that her medications help to alleviate the claimant's reports of disabling symptoms." AR 20. The ALJ cited to three notes in Jones's medical records that indicated she had not been compliant in taking medication, she had multiple no shows and cancellations at one of her providers, did not start therapy, took one risperidone pill per day instead of the prescribed two, and ran out of baclofen and gabapentin and did not obtain a refill. AR 20. Further, because "the record reflect[ed] that [Jones's] medications help to alleviate" her reports of disabling symptoms, the ALJ found that this suggested her symptoms may have not been as limiting Jones alleged. AR 20.

When assessing opinion evidence, the ALJ assigned significant weight to Dr. Bradus's "environment workplace limitations because they were based on a review of the records and account for [Jones's] severe vision loss." AR 21. The ALJ assigned "reduced weight" to Dr. Bradus's limitation that Jones could not perform jobs requiring fine discrimination at a distance or constant use of the eyes for close work because of her "ability to spend her days watching television, ability to drive a car, ability to use public transportation to travel, and [her] ability to go shopping in stores." AR 21.

The ALJ assigned reduced weight to Dr. De Souza's limitation that Jones could lift rarely,

14

carry less than 10 pounds, stoop rarely, and would be off-task 25 percent of a workday or more. AR 22.  The ALJ assigned reduced weight to these limitations because "they were not based on a long treating relationship, appear to be overly reliant on [Jones's] subjective reports, and are inconsistent with [Jones's] activities of daily living, which include cooking, traveling, shopping, and spending time with others."  AR 22.

The ALJ assigned "significant weight" to Dr. Fentress's finding that Jones was "able to sit, stand, and/or walk at least 6 hours each because this finding is consistent with [her] activities of daily living, her improvement of neuropathic symptoms with medications, and her unremarkable physical examination findings."  AR 23.  The ALJ assigned "reduced weight" to Dr. Fentress's statement that Jones could walk only 2 city blocks without resting or severe pain, his opinion that Jones would likely take two to three unscheduled breaks in a workday for 20 minutes each "due to pain/paresthesias and numbness," his estimation that Jones would be off-task for 20 percent of a typical workday due to her symptoms, his statement that Jones was incapable of even low stress jobs, and his note that Jones's psychological limitations were more significant than her physical and that her "functional impairments in attention and concentration related to her history of trauma and depression would make it very difficult or impossible for [her] to maintain regular employment."  AR 22–23.  The ALJ assigned reduced weight to these findings because she found they were "overly restrictive and inconsistent with the evidence as a whole and treatment notes indicating that the claimant had improved concentration and focus when on psychotropic medication."  AR 23.

The ALJ assigned significant weight to Dr. Khoi's opinion that Jones would continue to have "mental functioning limitations" even in the absence of substance abuse because the ALJ found this opinion was "consistent with [Jones's] continued mood complaints" even after maintaining relative sobriety.  AR 24.  However, the ALJ assigned "little weight" to Dr. Khoi's diagnoses and his opinions as to Jones's marked, moderate, and mild impairments, because the ALJ found these limitations were "overly restrictive, not based on a long treating relationship, and inconsistent with [Jones's] activities of daily living and minimal mental health treatment."  AR 24.

The ALJ also assigned little weight to the opinion of LCSW Smith because "a social

15

worker is not an acceptable medical source, his findings were not based on a long treating relationship with [Jones], and his limitations touch[ed] upon subject matter reserved to the Commissioner." AR 24. Smith's opinion included that Jones had "moderate to marked limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation," that Jones had mental health conditions that prevented her from working, that she could not work, and that she had major lumbar problems. AR 24.

The ALJ assigned little weight to Dr. Kohbod's opinion. AR 25. Dr. Kohbod diagnosed Jones with schizophrenia, paranoid type; alcohol dependence; cannabis abuse; and assigned her a GAF score of 50, "suggesting serious impairments in social, occupational or school functioning." AR 24. Dr. Kohbod also opined that Jones did not have adequate coping mechanisms or internal cohesion to deal with stress, and that her schizophrenia would prevent her from performing her past work or engaging in job related activities. AR 24. The ALJ found that Dr. Kohbod's opinion was "overly restrictive and inconsistent with [Jones's] activities of daily living and her minimal mental health treatment of record." AR 25. The ALJ found that "[i]n spite of Dr. Kohbod's findings," Jones received "regular" visits from her niece, was able to visit her daughter in Sacramento, was able to live in an apartment with a friend, and was able to go shopping for food. AR 25.

The ALJ additionally assigned significant weight to the findings of examining physician Dr. Rana (that Jones was able to walk around the examination room, was able fill out the information sheet, that her gait was stable, and that she had normal strength throughout, and opined that she did not have any physical limitations) because the ALJ considered them consistent with Jones's activities of daily living and based on a physical examination and objective medical findings. AR 21. However, the ALJ noted that she assigned "greater functional limitations" to Jones than the ones suggested by Dr. Rana because of the evidence at the hearing level and "some of" Jones's subjective complaints. AR 21. The ALJ then limited Jones to "less than medium exertional work" because it was consistent with her reports that she is able to walk a mile without problem and carry 30 pounds without issue. AR 21.

The ALJ also gave significant weight to the opinions of examining physician Dr. Hernandez, who opined that Jones "had no exertional limitations, no sitting or standing limitations, no pushing or pulling limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental workplace limitations." AR 22. The ALJ assigned significant weight to this opinion because it was "consistent with Dr. Rana's opinion and [Jones's] activities of daily living." AR 22. As with Dr. Rana's opinion, the ALJ stated she accounted for greater physical limitations in the RFC to account for evidence available at the hearing level and "some of" Jones's subjective complaints. AR 22.

The ALJ assigned significant weight to the opinions of non-examining physicians Dr. Barrons and Dr. Lucila, finding few limitations on Jones's ability to work, because they were "based on thorough reviews of the claimant's medical records" and they were "consistent with [Jones's] activities of daily living." AR 23.

The ALJ assigned no weight to the third-party statements of Jones's roommate, John Iles, because his statement gave "no opinion about [her] limitations or work abilities" and he said he did not know much about Jones's activities. AR 21. The ALJ assigned little weight to the opinion of non-examining physician Dr. Newton, who opined that Jones's physical impairments were non-severe because "this finding is inconsistent with the evidence made available at the hearing level and [Jones's] subjective complaints." AR 21. The ALJ also assigned little weight to the GAF scores assigned to Jones by Dr. Milton Lorig, Dr. James Relchmuth, and a first-time evaluating psychiatrist because "GAF scores standing alone without any explanation provide little probative value" and the scores were assigned to Jones "when she was dealing with the loss of her father and close friends." AR 24.

Based on the weights the ALJ assigned to the opinion evidence, at step four, the ALJ determined that Jones was not able to perform any of her past work and therefore at step five relied on the testimony of vocational expert Jose L. Chaparro to find that Jones has the residual functional capacity to perform medium work with the following limitations: never climb ladders, ropes, or scaffolds; kneeling and crawling would be occasional; has to avoid concentrated use of

hazardous machinery and concentrated exposure to unprotected heights; limited to occupations that do not require complex written or verbal communication; work is limited to simple as defined in DOT as SVP levels 1 and 2, routine and repetitive; can work in a low stress job defined as having only occasional decision making and only occasional changes in the work setting; can have only occasional interaction with the general public; and only occasional interaction with co-workers. AR 18, 123. Because there are jobs that exist in significant numbers in the national economy that Jones can perform, such as machine packager and laboratory equipment cleaner, the ALJ found that Jones was not disabled and not entitled to SSI. AR 26. At the hearing, the ALJ also asked the vocational expert what jobs Jones would be able to perform if Dr. Fentress's limitation that she would have to miss four days of work per month because of her impairments was true. AR 128. In that case, the vocational expert testified that Jones would not be able to perform any work at all. AR 128.

Jones filed this action on March 27, 2018. Shortly thereafter, Jones was notified that based on a subsequent application Jones submitted following the adverse decision she appeals from here, she was determined to be disabled and awarded benefits as of November 4, 2016. Dkt. No. 24.

## LEGAL STANDARD

### I. DISABILITY DETERMINATION

A claimant is "disabled" as defined by the Social Security Act if: (1) "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 1382c(a)(3)(A)–(B); *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012). To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis as required under 20 C.F.R. § 404.1520(a)(4)(i)–(v).

In the first two steps of the evaluation, the claimant must establish that he or she (1) is not performing substantial gainful activity, and (2) is under a "severe" impairment. *Id.* §

416.920(a)(4)(i)–(ii).  An impairment must have lasted or be expected to last 12 months in order to be considered severe.  *Id.* § 416.909.  In the third step, the claimant must establish that his or her impairments meets or medically equals a listed impairment described in the administrative regulations.  *Id.* § 416.920(a)(4)(iii).  If the claimant's impairment does not meet or equal one of the listed impairments, before proceeding to the fourth step, the ALJ is to make a residual functional capacity determination based on all the evidence in the record; this determination is used to evaluate the claimant's work capacity for steps four and five.  *Id.* § 416.920(e).  In step four, the claimant must establish that his or her impairment prevents the claimant from performing relevant work he or she did in the past.  *Id.* § 416.920(a)(4)(iv).  The claimant bears the burden to prove steps one through four, as "[a]t all times, the burden is on the claimant to establish [his] entitlement to disability insurance benefits."  *Id.* (alterations in original).  Once the claimant has established this prima facie case, the burden shifts to the Commissioner to show at the fifth step that the claimant is able to do other work, and that there are a significant number of jobs in the national economy that the claimant can do.  *Id.* §§ 416.920(a)(4)(v), (g); 416.060(c).

The SSA has found Jones to be disabled as of November 4, 2016.

## II.     STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and free of legal error.  *See Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.1996); *see also DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991) (ALJ's disability determination must be supported by substantial evidence and based on the proper legal standards).  Substantial evidence means "'more than a mere scintilla,' but less than a preponderance."  *See Saelee v. Chater*, 94 F.3d 520, 521–22 (9th Cir. 1996) *quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *See Richardson*, 402 U.S. at 401 (internal quotation marks and citation omitted).

This Court must review the record as a whole and consider adverse as well as supporting evidence.  *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld.  *See*

*Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *See Robbins*, 466 F.3d at 882 *quoting Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

## DISCUSSION

Jones argues that the ALJ committed six errors: (i) the ALJ improperly omitted Jones's lower back pain as a severe impairment at Step Two; (ii) the ALJ rejected Jones's statements about her symptoms and ability to function without providing specific, clear, or convincing reasons supported by substantial evidence; (iii) the ALJ improperly rejected the opinions of Jones's treating and examining physicians; (iv) the ALJ erred by rejecting a non-examining physician's opinion without reference to specific evidence in the record; (v) the RFC does not accurately reflect Jones's limitations and is not supported by substantial evidence; and (vi) the ALJ relied on vocational expert testimony based on an incomplete hypothetical. Mot. at 9.

## I.     LOWER BACK PAIN

At Step Two, the ALJ concluded that Jones's reported back and ankle pain were non-severe impairments because "imaging studies of the claimant's lumbar spine revealed only mild disc degeneration at L5-S1" and "numerous musculoskeletal examinations revealed a normal back with a normal range of motion, normal extremities, no evidence of steroid injections, and minimal physical therapy treatment related to a personal injury claim." AR 15–16. Jones argues that by doing so, the ALJ assessed her with a RFC that does not include all of her limitations. Mot. at 10–11.

An impairment is not severe if it does not significantly limit the claimant's physical ability to do basic work activities. *Smolen*, 80 F.3d at 1290. "An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Id.* At the step two inquiry, the ALJ must consider the claimant's subjective symptoms in determining severity. *Id.* This step is a "de minimis screening device to dispose of groundless claims." *Id.* (citing *Bowen v. Yuckert*, 482

U.S. 137, 153–54 (1987)).

The medical evidence in the administrative record and Jones's testimony demonstrate that Jones's back pain significantly limits her physical ability to do basic work activities.[7]  The Commissioner relies on *Pederson v. Comm'r Soc. Sec. Admin.*, 405 Fed. App'x 117, 119 (9th Cir. 2010) (unpublished) to argue first that the ALJ has made a harmless error because she considered the collective impact of all of Jones's impairments when assessing the RFC and, therefore, the failure to include back pain as an RFC as not-severe was at most harmless error.  Oppo. at 2.  But in *Pederson*, the claimant's limitations omitted from the Step Two analysis were "covered by the hypothetical ultimately presented to the vocational expert."  *See Pederson*, 405 Fed. App'x at 119. Here, the ALJ presented the vocational expert with a hypothetical that assessed Jones with the ability to do medium work, without consideration of significant back pain and which was at odds with the limitations she reports and her treating physician's opinion that her pain would force her to take two to three unscheduled breaks of 20 minutes each during a working day.  AR 126 (Jones's 2016 hearing testimony), 822 (Dr. Fentress's 2016 Medical Source Statement).  In addition, there is no evidence in the decision itself showing that the ALJ considered or addressed how Jones's lower back pain was assessed.  *See* Oppo. at 2; AR 19.

The Commissioner also argues that the ALJ did not err because the medical evidence does not corroborate Jones's self-reported complaints of back pain.  Oppo. at 3.  But this argument ignores the medical evidence in the record that shows Jones received treatment on multiple occasions for her back pain.  *See* AR 608 (Barbara Turner NP diagnosing back pain as a "chronic condition" and prescribing medication in August 2014), 627–36 (receiving treatment at Save A Life Wellness Center in January 2013 for back pain rated 7/10 to 9/10 and receiving prescription of Baclofen, Norco, and Vicodin), 642 (receiving treatment at Save A Life Wellness Center in

---

[7] In Opposition, the Commissioner argues that the alleged error is not reversible because pain is a symptom and not an impairment.  Oppo. at 3.  However, ALJs routinely find pain to be a severe impairment under the Step Two analysis.  *See, e.g.*, *DeLozano v. Colvin*, No. 13-cv-03726-JCS, 2015 WL 1431755, *6 (N.D. Cal. Mar. 27, 2015) (noting ALJ found pain to be a severe impairment); *Gaona v. Colvin*, No. 13-cv-03204 JCS, 2014 WL 1614846, *6 (N.D. Cal. Apr. 21, 2014) (same); *Hann v. Colvin*, No. 12-cv-06234-JCS, 2014 WL 1382063, *11 (N.D. Cal. Mar. 28, 2014) (same); *Reed v. Astrue, Comm'r of Soc. Sec.*, No. C 07-3198 CW, 2008 WL 3925643 (N.D. Cal. Aug. 22, 2008) (same).

December 2012 for back pain that made her "unable to walk at times" and that got "worse with standing"), 653 (Barbara Turner NP assessing Jones as having "back pain unspecified" in June 2015), 668–71 (receiving treatment for "chronic low back pain" from Maria Aguilar, MD in September 2015), 790–93 (Dr. Fentress diagnosing Jones with "[l]ow back pain without sciatica, unspecified back pain laterality" and prescribing baclofen).  Given the de minimis nature of the step two inquiry and that the ALJ assessed Jones for an RFC that does not obviously account for or address her lower back pain, the ALJ's error was not harmless.

## II.    JONES'S STATEMENTS

Jones also argues that the ALJ improperly discounted her statements as to her symptoms and limitations by mischaracterizing and overemphasizing Jones's testimony about her daily life activities.  To determine whether a claimant's testimony is credible, an ALJ must engage in a two-step analysis.  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which would reasonably be expected to provide the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F. 3d 1028, 1035–36 (9th Cir. 2007) (internal quotation marks omitted).  "If the claimant satisfies the first step of the analysis, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'"  *Garrison*, 759 F.3d at 1014–15 (quoting *Smolen*, 80 F.3d at 1281).  "[T]he ALJ must give 'specific, clear, and convincing reasons for rejecting' the testimony by identifying '*which* testimony [the ALJ found not credible' and explain 'which evidence contradicted that testimony."  *Laborin v. Berryhill*, 867 F.3d 1151, 1155 (9th Cir. 2017) (quoting *Brown-Hunter v. Colvin*, 806 F.3d 487, 498, 494 (9th Cir. 2015) (alterations in original).  "The clear and convincing standard is the most demanding required in Social Security cases."  *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002).

While the ALJ found that Jones's medically determinable impairments could reasonably be expected to cause her symptoms, she concluded that Jones's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in this record."  AR 20.  The ALJ, however, rejected Jones's

statements about her symptoms because the ALJ determined that Jones's reported activities of daily living were "not as limited as one would expect" and that Jones was not compliant in taking her prescribed medications, suggesting that her symptoms were not as limiting as she alleged. AR 20.

### A. Jones's activities of daily living

As an initial matter, I find that the ALJ's determination that Jones's reported symptoms are inconsistent with her activities of daily living is based on an inaccurate and incomplete characterization of the evidence by the ALJ and, therefore, is not supported by substantial evidence. The evidence of daily activities relied on by the ALJ included the facts that although Jones alleged that she is too afraid to leave her house and does not spend time with others, Jones admitted that she "goes outside for walks, receives frequent visits from her niece, and is able to visit her daughter in Sacramento." AR 20. In addition, the ALJ noted that Jones reported "being able to go shopping in stores, being able to prepare her own meals, being able to drive a car, and spending her days watching television." AR 20. While the Commissioner argues in Opposition that Jones's activities of daily living contradict the limitations she alleged, Jones's testimony and other evidence in the record is consistent with her allegation that she is too afraid to leave her house and does not spend time with others. *See* Oppo. at 4.

Jones has repeatedly reported to her medical providers that she spends most of her time alone and is scared to leave the house. AR 414 (reporting to Sausal Creek Medical Center in August 2012), 601 (reporting to Dr. Kohbod during visits in 2014), 759 (reporting to Sausal Creek Medical Center in December 2015), 778 (reporting to NP Green in February 2016), 782 (reporting to NP Green in January 2016), 811 (reporting to NP Green on March 22, 2016). In addition, Jones testified at her hearing and has reported in the past that this is because she is afraid of what might happen if she suddenly cannot see. AR 107 (testifying at hearing in June 2016 that she does not leave her house because she does not know when her eyesight will "go out"), 778 (telling NP Green in February 2016 that she continues to be afraid of leaving the house because she is "scared of what might happen."). In her March 2014 Function Report, she reported that in fact she does not go anywhere on a regular basis, but only goes to the grocery store once a month. AR 330–31.

United States District Court
Northern District of California

Jones actually confirmed at her hearing that she does not go anywhere by herself and has previously stated that she finds it difficult to take the bus because she does not like to be around crowds due to her eyesight. AR 112 (testifying at June 2016 hearing), 778 (reporting to NP Green in February 2016). In 2014 Jones indicated that she "sometimes" drives, but in 2016 she said she did so only with her roommate and rarely because she starts to panic about other cars hitting her while doing so. AR 330 (2014 Function Report), 778 (reporting to NP Green in 2016). As to going out more generally, at the hearing, Jones described the last time she left her house to go on a walk on an unspecified date, but during the walk her eyesight blurred, she heard a dog, became afraid, and ran back to her house. AR 106–07. She then explained that if someone walks with her, she does not get afraid and that is why she does not go out by herself. AR 107. Because Jones is afraid to leave her house, she spends her days watching television. *See* AR 121, 331.

Jones also testified that though her niece came to visit her and that she went to go visit her daughter, "people rarely come over" and that she is "always by [herself]." AR 109–10, 117, 120. Although the ALJ has characterized the visits from her niece as "frequent," there is no evidence in the record as to what that means or facts that support it. Similarly, although there is evidence that Jones has seen her daughter who lives in Sacramento, there is little evidence about how frequently those visits take place, whether they take place at Jones's home or whether Jones travels to Sacramento. If Jones does travel to Sacramento to visit her daughter, there is no evidence in the record demonstrating how she gets there. These sporadic visits with and from a very limited pool of relatives and minimal interactions with the public is not significant much less substantial evidence on which the ALJ could have relied to discount her subjective statements as to her limitations or undercut the opinion evidence of Dr. Fentress, Dr. Kohbod, Dr. Khoi, and Dr. De Souza.

In addition, although the ALJ found that Jones's ability to prepare her own meals was evidence that her activities of daily living were inconsistent with her reported impairments, Jones has repeatedly stated that she makes only microwave dinners for herself that take two or three minutes to prepare because she "can't stand long." AR 109 (June 2016 hearing testimony), 329 (March 2014 Function Report). Further, Jones has consistently reported experiencing low appetite

24

and testified at the hearing in front of the ALJ that she had not eaten in four days. AR 109 (June 2016 hearing testimony), 742 (August 2012 consultation with Dr. Milton Lorig), 759 (December 2015 Sausal Creek Crisis Assessment), 773 (February 23, 2016 visit with NP Green), 778 (February 2, 2016 visit with NP Green), 781–82 (January 2016 visit with NP Green), 814 (March 2016 visit with Dr. Fentress). And while the ALJ used Jones's ability to drive as evidence that her visual impairments are not as severe as she alleged, the record in context indicates that Jones does not drive frequently and never alone because she is afraid of her vision blurring while behind the wheel. AR 330 (March 2014 Function Report), 778 (February 2016 visit with NP Green).

Finally, although Jones admitted to spending time with family and that she goes to the store once a month, the Ninth Circuit has recognized the disability claimants "should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The Ninth Circuit has also held that "the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to [] overall disability." *Orn*, 495 F.3d at 639 (internal quotations and citation omitted). An adverse credibility finding based on activities may be proper "if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace." *Id.* "The ALJ must make "specific findings relating to [the daily] activities" and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination." *Id.* The ALJ did not do so here, but instead described activities "so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace." *See id*.

Therefore, the ALJ's conclusion that Jones's activities of daily living are inconsistent with the alleged severity of her impairments is not supported by specific, clear, or convincing evidence. Instead, the ALJ mischaracterized the extent, nature, and significance of her consistently reported and very limited daily life activities.

### B. Compliance with Medication

The ALJ similarly relied on an incomplete reading of Jones's medical history to conclude that Jones had not been compliant in taking her medication and holding that non-compliance against her as evidence that her symptoms and conditions were not as severe or limiting as Jones's

claimed. Though an "unexplained, or inadequately explained, failure to seek treatment or following a prescribed course of treatment" can be evidence sufficient to discredit a claimant's testimony, the ALJ's determination that Jones was not compliant in taking her medication is not supported by substantial evidence. *See Orn*, 495 F. 3d at 638 (holding that if a "good reason" applies, failing to seek treatment or to follow a course of treatment cannot be the basis for an adverse credibility finding.).

The ALJ cites four examples from Jones's medical history to show Jones's non-compliance. The first comes from Dr. Kohbod's assessment that reads in full: "[Jones] is motivated to receive treatment, though in the past she has not always been medication compliant." AR 600. The ALJ also relied on NP Shana Green's observation that since Jones's initial visit to the clinic, she had "multiple no shows/cancellations and did not start with therapy. AR 777. But the ALJ omitted Green's observation from the following page that Jones was experiencing problems with "transportation and forgetfulness" that could explain her non-compliance. AR 777–78. The ALJ then relied on Jones's admission to NP Green on February 5, 2016 that she only takes one risperidone pill at night rather than two during the day, but failed to mention that NP Green discussed with Jones that she may continue to take only one pill at night if that dosage allowed "for the remission of voices." AR 780. Additionally, at a follow up visit with NP Green on February 23, 2016, Jones's prescription was adjusted down to one risperidone pill each day. AR 773. Finally, the ALJ noted that Jones had run out of baclofen and gabapentin and did not follow up with her primary care provider. However, the ALJ ignored the following comment from NP Green on March 22, 2016, which said that Jones had not followed up with her primary care provider because she mistook the date of her appointment and came to the clinic on a day it was closed. AR 811.

In sum, this is not substantial evidence that Jones has a demonstrated history of non-compliance with her prescribed course of treatment. Rather, this provides *more* evidence of her marked mental impairments, including forgetfulness. AR 407, (Dr. Khoi finding Jones has "marked" impairment in ability to understand and remember detailed instructions in 2011), 600–01 (Dr. Kohbod describing Jones's memory as "below average" in 2014), 774 (NP Green

conducting mental status exam in February 2016 and finding that Jones "has difficulty with dates/times"), 777–78 (reporting to NP Green that Jones missed her appointments due to "forgetfulness"), 784 (NP Green conducting mental status evaluation in January 2016 and finding Jones's recent and remote memory is "inconsistent"), 811 (NP Green noting Jones mistook the date of her appointment in March 2016), 824 (Dr. Fentress noting Jones's "inability to regularly follow-through with appointments and other instructions" in June 2016).  As the Ninth Circuit has recognized, "[w]e do not punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view such departures from prescribed treatment as part of the claimants' underlying mental afflictions."  *Garrison*, 759 F.3d at 1018 n.24.

Additionally, though the ALJ found that Jones's condition improves when she takes medication, the record does not support that her improvements obviate any limitations.  With respect to her physical conditions, even when Jones reported generally feeling well after taking medication, she still experienced ongoing tingling in her feet.  AR 668 (September 2015 visit to Alameda Health System), 701 (September 2015 visit to Alameda County Medical Center), 759 (December 2015 visit to Sausal Creek).  Further, even when Jones stops hearing voices and shows improved concentration and focus on her medications, her anxiety and depression still remain. AR 773 (reporting in February 2016 to NP Green that she continues to struggle with depression), 787 (December 2015 reporting feelings of anxiety to Dr. Fentress), 812 (reporting in March 2016 to NP Green that her symptoms of depression have not improved or worsened and endorsing high anxiety since starting Cymbalta).  Jones's alleged medication non-compliance is not supported sufficient to be a specific, clear, and convincing reason for rejecting Jones's testimony as to her symptoms and limitations.[8]

---

[8] In Opposition, the Commissioner argues two points to support the ALJ's decision to discount Jones's testimony regarding the debilitating effects of her impairments: first, that the two-year time period between Jones's alleged disability onset date and the date she was first prescribed psychotropic medication, Oppo. at 5; and second, that gaps in Jones's mental health treatment did not "cause any exacerbations or result in emergency medical or psychiatric care."  *Id.*  However, the ALJ did not raise either of these points in her decision.  *See* AR 20.  Because I am "constrained to review the reasons the ALJ asserts," I need not analyze these arguments.  *See Stout v. Commissioner, Social Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006)

### III.    EXAMINING AND TREATING SOURCES

Jones argues that the ALJ impermissibly discounted treating and examining opinion evidence in favor of the opinions of consultants who did not even examine Jones.  The Ninth Circuit classifies the three types of physicians that can provide information on a claimant as:  "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine not treat the claimant (non-examining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The weight that the ALJ must give each of those categories of opinions and when the ALJ can disregard opinions from each of those sources vary.

#### A.    Dr. Fentress and Shana Green, N.P.

Jones argues that the ALJ erred by rejecting key portions of the opinion of Jones's treating physician, Dr. Fentress, and by implicitly rejecting in full the opinion of his nurse practitioner, Shana Green.  Mot. at 16.

"As a general rule, more weight should be given to the opinion of a treating [physician] than to the opinion of doctors who do not treat the claimant."  *Lester*, 81 F.3d at 830.  Where a treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons.  *Id.*  Where the opinion is contradicted, it may be rejected only by providing "specific and legitimate reasons supported by substantial evidence in the record for doing so."  *Id.* (internal quotation marks omitted).  When an ALJ fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, the Ninth Circuit credits the opinion as true as a matter of law.  *Id.* at 834.

The ALJ assigned "partial weight" to Dr. Fentress's opinion.  AR 23.  Significant weight was given to Dr. Fentress's opinion that Jones "is able to sit, stand, and/or walk at least 6 hours each" because it was consistent with Jones's activities of daily living, that her condition improved with medication, and her "unremarkable physical examination findings."  AR 23.  The ALJ gave "reduced weight" to the remainder of Dr. Fentress's findings, including his opinion that Jones's "functional impairments in attention and concentration related [to her] history of trauma and depression" would make it "very difficult or impossible" for her to work, because they were

"overly restrictive" and "inconsistent with the evidence as a whole and treatment notes indicating that the claimant had improved concentration and focus when on psychotropic medications." *See* AR 23; 824.

The ALJ cited to one piece of evidence to show that Jones's condition improved with treatment and to reject all of Dr. Fentress's findings but his opinion that Jones would be able to sit, stand, and walk for at least six hours during a normal working day; namely the improvement in Jones's mental health symptoms when she was on her medicine. AR 23. The Commissioner cites to this same piece of evidence in Opposition to argue that the ALJ properly found Jones's condition improved with psychotropic medication. Oppo. at 7. Though NP Green commented that Jones had "improved concentration and focus" with medication, but NP Green also noted that Jones still experienced "difficulty with dates/times" and "low mood, poor motivation, transient suicidal ideations, and poor appetite." AR 774. Jones's hearing testimony is consistent with this finding, where she reported she still needed reminders to make her appointments and take her medications, had little interest in eating, and spent her days watching the television despite being compliant with her medications. AR 108, 111–12. Further, because Jones has testified that she experiences "bad days and good days," it was error for the ALJ to pick out one instance of temporal improvement as evidence that Jones is capable of working consistently. *See* AR 117; *Garrison*, 759 F.3d at 1017 ("Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and treat them as a basis for concluding a claimant is capable of working.").[9]

Jones also argues that the ALJ erred in wholly ignoring NP Green's psychiatric

---

[9] The ALJ also rejected the majority of Dr. Fentress's findings because they were "overly restrictive." AR 23. But this on its own is not a specific and legitimate reason supported by substantial evidence for rejecting the portions of his opinion that detail Jones's limitations. "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison*, 759 F.3d at 1012 (quoting *Reddick*, 157 F.3d at 725). "[A]n ALJ errs when [he or she] rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012–13.

assessment, although the ALJ did use a note from a visit with NP Green to support her conclusion that Jones's condition improved with medication. *See* AR 23, 774. As noted, Dr. Fentress referred Jones to NP Green for a psychiatric assessment. AR 781. NP Green's visit notes support Dr. Fentress's opinion that Jones's mental impairments are more limiting than her physical ones and, despite improvements on medications, would still make it near impossible for her to maintain employment. *See* AR 824. NP Green administered PHQ-9 and GAD-7 tests during her initial visit with Jones, finding that Jones had "severe depression" and her anxiety was also "severe." AR 784. At this initial visit, NP Green also noted that Jones exhibited "symptoms of Post Traumatic Stress Disorder . . . panic and anxiety, anger and fear, [and] anhedonia" and recommended that Jones start on Cymbalta. AR 784–85. At a visit in March, NP Green listed Jones's diagnosis as "Episode of recurrent major depressive disorder, unspecified depression episode severity." AR 812. NP Green's visit notes detail Jones's feelings of depression (AR 774, 778, 784, 811), fears about leaving her house (AR 774, 779, 782, 811), and thoughts of suicide (773, 778, 811). These findings are consistent with the mental limitations that Dr. Fentress opined Jones had. Because the ALJ's opinion did not account for NP Green's findings and observations, her rejection of Dr. Fentress's opinion is not supported by substantial evidence in the administrative record.[10]

The Commissioner argues in Opposition that the ALJ properly weighed the medical-opinion evidence generally but does not argue why the ALJ was justified in discounting the opinion of Dr. Fentress specifically. *See* Oppo. at 6. Instead, the Commissioner contends that the ALJ "settled in the middle ground" between medical opinions that found Jones had few or no limitations (such as Dr. Hernandez's opinion) and medical opinions that found Jones was incapable of even low-stress work (including Dr. Fentress's opinion). *Id.* But as a treating physician, the ALJ needed to discount Dr. Fentress's testimony with specific and legitimate

[10] The ALJ also used Jones's "activities of daily living" to accept Dr. Fentress's opinion that Jones was able to sit, stand, and/or walk at least 6 hours each. AR 23. However, because Jones's activities of daily living are not as substantive or as frequent as the ALJ characterized them, as discussed above, her activities of daily living corroborate much more of Dr. Fentress's findings than what the ALJ accepted.

evidence from the record that was supported by substantial evidence. *See Lester*, 81 F.3d at 830. The ALJ did not do so here.

### B.     Dr. Andrea De Souza

Jones argues that the ALJ erred by assigning "reduced weight" to examining optometrist Dr. Andrea De Souza's opinion. "The opinion of an examining physician is . . . entitled to greater weight than the opinion of a non-examining physician." *Lester*, 81 F.3d at 830. As with treating physicians, the ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician and "specific and legitimate reasons that are supported by substantial evidence" for rejecting the contradicted opinions of an examining doctor. *Id.*

Dr. De Souza opined that Jones would be unable to avoid ordinary workplace hazards, would have difficulty walking up and downstairs, and would be off-task 25% of a workday or more. AR 802–03. The ALJ rejected Dr. De Souza's limitations because her observations were not based on a long treating relationship, appeared overly reliant on Jones's subjective reports, and were inconsistent with Jones's activities of daily living.

Length of treating relationship is one factor ALJs consider when evaluating medical source opinions in a disability determination. 20 U.S.C. § 404.1527(c)(2). However, while this would be a reason to give less weight to Dr. De Souza's opinion than to the opinion of a treating physician, it is not a reason to give preference to the opinion of a doctor who has not examined Jones. *See Lester*, 81 F.3d at 832. Here, the ALJ assigned "significant weight" to the opinion of Dr. Lucila, a state agency medical consultant who never examined Jones and determined that Jones was able to be aware of usual workplace hazards and to travel by public transportation. AR 23, 179. This reason for discrediting Dr. De Souza's findings is not clear and convincing, specific or legitimate, or supported by substantial evidence.

The ALJ also found Dr. De Souza's opinion to be "overly reliant" on Jones's subjective complaints, and the Commissioner argues that Dr. De Souza relied on Jones's claims because she did not "describe or submit any medical findings explaining or supporting her opinion." *See* AR 22; Oppo. at 7. "[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the plaintiff's complaints where

United States District Court
Northern District of California

the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199–1200 (9th Cir. 2008). Here, there is evidence that De. Souza's opinions were based on her own independent testing.

For example, the record includes Dr. De Souza's Optometry Chart Note from the day she examined Jones; it shows that De Souza conducted a visual acuity test and an external examination and made an ophthalmology impression/plan that day. AR 804–08. These notes indicate that Jones's visual acuity test in her right eye was 20/50 and was 20/HM in her left. AR 805. Dr. De Souza also diagnosed Jones with a macular scar in her left eye, vision loss of right eye, glaucoma suspect of right eye, hyperopia, and astigmatism. AR 807. These findings are consistent with others in Jones's medical record, support De Souza's opinions, and were not addressed by the ALJ. *See* AR 614 (2014 diagnosis from Tanya Gill, O.D. that Jones had "reduced vision" and a visual acuity of 20/60 in her right eye and "loss of vision" and a visual acuity of 20/HM in her right), 661–64 (2015 diagnosis from Oakland Vision Center showing a visual acuity of 20/60 in her right eye and 20/HM in her left), 827 (2016 visual acuity test from Jane Loman, O.D. showing a visual acuity of 20/80 in her right eye and 20/400 in her left and noting that Jones "can't see" out of her left eye). The "overly reliant" reason for rejecting Dr. De Souza's testimony is not supported by substantial evidence.

Though Dr. Hernandez observed that Jones was "able to fill out the patient intake form correctly" and "seemed to ambulate well about the room without any problem," this piece of testimony is not a specific and legitimate reason supported by substantial evidence to discount Dr. De Souza's opinion. AR 593. Dr. De Souza is a specialist in optometry and "[w]e generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5); *see Garrison*, 759 F.3d at 1013. Further, Dr. Hernandez assessed that Jones had "no visual limitations," which is not supported by the undisputed evidence in Jones's medical record. AR 596.

Finally, the ALJ discredited Dr. De Souza's findings because they were inconsistent with Jones's activities of daily living, which include "cooking, traveling, shopping, and spending time

with others." AR 22.  As I have discussed above, the ALJ mischaracterized Jones's activities of

daily living, which are not as substantial or frequent as the ALJ considered them to be.

Because the ALJ did not provide specific and legitimate reasons, supported by substantial

evidence for rejecting Dr. De Souza's opinion, she committed legal error.

### C.    Dr. Sokley Khoi and Dr. Aliyeh Kohbod

Jones also challenges the ALJ's assignment of "little weight" to certain opinions of

examining psychologists Dr. Sokley Khoi and Dr. Aliyeh Kohbod.  AR 23–24.  While the ALJ

assigned significant weight to Dr. Khoi's October 2011 finding that Jones would have

impairments even without substance abuse, she assigned little weight to the majority of Dr. Khoi's

functional limitations because they were "overly restrictive, not based on a long treating

relationship, and inconsistent with the claimant's activities of daily living and minimal mental

health treatment."  AR 24.  These limitations included marked impairments in the ability to:

understand and remember detailed instructions; carry out detailed instructions; maintain adequate

pace and persistence to perform complex/detailed tasks; and, withstand the stress of a routine work

day.  AR 407.  The ALJ assigned little weight to the entirety of Dr. Kohbod's May 2014 opinion

because it was "overly restrictive and inconsistent with the claimant's activities of daily living and

her minimal mental health treatment of record."  AR 25.

As stated above, rejecting the majority of Dr. Khoi's assessment because Jones did not

have a longstanding treating relationship with him is not a specific and legitimate reason to do so,

particularly because the ALJ assigned significant weight to other doctors who never examined

Jones.  *See* AR 23.

The ALJ's assessment that Drs. Khoi and Kohbod's findings are inconsistent with Jones's

activities of daily life is not supported by substantial evidence because, as discussed above, the

ALJ mischaracterized Jones's activities of daily living.  The ALJ states that "in spite of Dr.

Kohbod's findings," Jones receives visits from her niece, visits her daughter in Sacramento, lives

in an apartment with a friend, and goes shopping.  AR 25.  But the frequency and conditions under

which those activities occurred – rarely and usually supported by relatives or friends – were

ignored by the ALJ.  In addition, it is not clear that any of these limited activities conflict with Dr.

33

Kohbod's findings that Jones lacks the ability to deal with stress, isolates herself from most social relationships, and suffers from schizophrenia. AR 600, 604–05. The ALJ did not specify any activity of daily living that was particularly inconsistent with Dr. Khoi's findings.

Dr. Khoi assessed Jones as suffering from major depressive disorder, having marked impairments in understanding and memory, and having marked impairments in the ability to withstand the stress of a routine work day and interact appropriately with coworkers. Jones has continually reported symptoms consistent with this assessment. For example, at her hearing, she testified that she is depressed, that she forgets to take her medication and attend appointments, and that she became so scared at the sound of a dog barking that she returned home. AR 106–07, 111–12, 117. Rejecting Drs. Khoi and Kohbod's opinions for being inconsistent with Jones's activities of daily living is not supported by substantial evidence.

Finally, the ALJ rejected the majority of Drs. Khoi and Kohbod's opinions because of Jones's "minimal mental health treatment." AR 23, 25. This statement is contrary to the evidence in the record, which demonstrates that Jones has received mental health treatment – albeit somewhat sporadic and at times of crisis – from numerous providers over the course of years. AR 413–26 (August 2012 Crisis Assessment at Sausal Creek), 638 (December 2012 visit to Save a Life Wellness Center), 742 (August 2012 assessment at Alameda County Medical Center), 755–67 (December 2015 visit to Sausal Creek Outpatient Stabilization Clinic), 772 (February 2012 visit to Lifelong Medical Care), 777 (February 2016 visit to Lifelong Medical Care), 781 (January 2016 visit to Lifelong Medical Care), 810 (March 2016 visit to Lifelong Medical Care). Further, the Ninth Circuit has "particularly criticized the use of a lack of treatment to reject mental health complaints both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–300 (9th Cir. 1999) (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)). In addition, there is evidence in the medical record that Jones's impairments contribute to gaps in her treatment. *See* AR 668 (misunderstanding her medication in 2015), 777 (missing appointments in 2016 due to forgetfulness and her fear of leaving the house), 811 (missing an appointment because

34

she mistook the dates in 2016).

Therefore, the ALJ's reasoning for rejecting the opinions of Drs. Khoi and Kohbod is not supported by substantial evidence.

### D.     LCSW Rudolph Smith

Jones argues that the ALJ erred by assigning "little weight" to the entirety of LCSW Rudolph Smith's opinion.  AR 24.  Smith evaluated Jones in December 2012 and opined that she had marked limitations in the ability to remember work-like procedures, maintain attention for extended periods, maintain regular attendance, sustain ordinary routine without special supervision, make simple work-related decisions, and get along with co-workers and peers without unduly distracting them or exhibiting behavioral extremes.  AR 638.  He also opined that she had moderate restrictions in her ability to understand and remember very short and simple instructions, to carry out very short and simple instructions, and to be aware of normal hazards and take appropriate precautions.  AR 638.  Smith finally opined that Jones's mental health conditions prevented her from working.  AR 639.

The ALJ rejected Smith's opinion for three reasons:  a social worker is not an acceptable medical source; Smith's findings were not based on a long treating relationship; and Smith's limitations "touch upon subject matter reserved to the Commissioner."  The Commissioner argues that Smith's opinion is a "non-medical opinion from a non-medical source" and argues that the ALJ provided specific and legitimate reasons for discounting it.  Oppo. at 7.

Like a nurse practitioner, a social worker is not an acceptable medical source, but is an "other source" whose opinion must be evaluated and discounted with a "germane reason" for doing so.  *See* Ghanim v. Colvin, 763 F.3d 1154, 1161, 1169 (9th Cir. 2014); *see also Johnson v. Berryhill*, No. 17-cv-06561-DMR, 2019 WL 1369933, at *12 (N.D. Cal. Mar. 26, 2019) (noting that an ALJ must give reasons "germane to" each lay witness, including licensed clinical social workers, before discounting their testimony).  Simply stating that a social worker is not an acceptable medical source is not a germane reason for discounting Smith's opinion.  Similarly, though Smith examined Jones only once, this is not in and of itself a germane reason for assigning little weight to his opinion.  *See Lester*, 81 F.3d at 832.

That Smith's limitations "touch upon subject matter reserved to the Commissioner" is not a reason germane to rejecting Smith's findings that Jones had moderate to marked limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation, and a mental health condition that would prevent her from working. AR 638–39. These findings are consistent with reports from Dr. Fentress, NP Green, Dr. Kohbod, and Dr. Khoi. The ALJ's decision to assign little weight to Smith's opinion is not supported by substantial evidence. AR 407 (October 2011 visit with Dr. Khoi), 606 (2014 visits with Dr. Kohbod, 773–74 (February 2016 visit with NP Green), 784 (January 2016 visit with NP Green), 824 (June 2016 Medical Source Statement from Dr. Fentress).

### E.     Dr. Bradus

Dr. Bradus, a state agency medical consultant, reviewed Jones's medical records and opined that Jones could "perform jobs that did not require fine discrimination at a distance or constant use of the eyes for close work." AR 177. "The Commissioner may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998) (citation omitted). The ALJ assigned reduced weight to this opinion "given the claimant's ability to spend her days watching television, ability to drive a car, ability to use public transportation to travel, and the claimant's ability to go shopping in stores." AR 21.

This assertion is not supported by substantial evidence because, as stated above, the ALJ mischaracterized Jones's activities of daily living. Though Jones reported in 2014 that she uses public transportation, more recently, to NP Green in 2016 and at her hearing in front of the ALJ, she has stated that she does not use public transportation to travel because of her concerns about her eyesight. AR 112, 330, 778. Further, this characterization of Jones's activities does not mention that Jones does not go anywhere by herself. AR 112. Though she does watch television and go shopping once a month for twenty minutes, the ALJ failed to make any specific findings about how these abilities would translate to a workplace environment. *See Fair*, 885 F.2d at 603.

Jones also argues that while the ALJ stated she assigned "significant weight" to Dr. Bradus's opinion that Jones should avoid even moderate exposure to hazards, the ALJ implicitly

rejected this opinion in assessing Jones with an RFC that does not include any vision limitations, despite finding Jones's loss of vision to be a severe impairment at Step Two. Mot. at 22–23; *see* AR 15, 18. I agree. Because the ALJ did not reject this portion of Dr. Bradus's opinion with reference to specific evidence in the record and did not include this opinion in the eventual RFC assessment, the ALJ has committed legal error. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (citing 20 C.F.R. §§ 404.1523, 416.923) ("If the ALJ finds a severe impairment at step two, that impairment must be considered in the remaining steps of the sequential analysis.").

## IV.    JONES'S RESIDUAL FUNCTIONAL CAPACITY

A claimant's residual functional capacity is the most she can still do despite limitations. 20 C.F.R. § 416.945(a)(1). When assessing a claimant's RFC, the ALJ must consider all medically determinable impairments, including those that are not severe. § 416.945(a)(2).

The ALJ found that Jones had the residual functional capacity to perform "medium work" with the following limitations: "never climb ladders, ropes, or scaffolds; kneeling and crawling would be occasional; has to avoid concentrated use of hazardous machinery and concentrated exposure to heights; limited to occupations that do not require complex written or verbal communication; work is limited to simple . . . , routine and repetitive; can work in a low stress job defined as having only occasional decision making and only occasional changes in the work setting; can have only occasional interaction with the general public; and only occasional interaction with co-workers." AR 18. The ALJ stated that this assessment was supported by medical evidence, the claimant's activities of daily living, and partially supported by some of the opinions of the State agency medical consultants and examining physicians. AR 25. The Commissioner argues that the ALJ's RFC assessment was supported by substantial evidence. Oppo. at 8.

As discussed above, the ALJ did not provide adequate reasons for rejecting the opinions of Dr. Fentress, Dr. De Souza, Drs. Khoi and Kohbod, and LCSW Smith. Because the ALJ did not account for these opinions in the RFC assessment, the RFC does not include the limitations they assessed and is not supported by substantial medical evidence. The ALJ failed to include all of

37

Jones's impairments in determining her residual functional capacity. Therefore, the ALJ asked an incomplete hypothetical question of the vocational expert. The hypothetical did not take account of Jones's limitations because of her mental impairments; specifically, the hypothetical ignored Dr. Fentress's opinion that Jones's mental impairments would cause require her to take two to three unscheduled 20 minute breaks each day and would cause her miss more than four days of work each month. AR 822–24.

The ALJ also used an inaccurate and incomplete version of Jones's activities of daily living to reject Jones's subjective complaints, as discussed above. Because the ALJ failed to find specific and legitimate reasons for finding Jones's alleged symptoms not credible, the ALJ was "therefore required to include these limitations in this assessment of [Jones's] RFC. Because the ALJ did not do so, substantial evidence does not support the ALJ's RFC assessment . . . ." *See Lingenfelter v. Astrue*, 504 F.3d at 1055.

## V. REMEDY

"The decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). Jones asks that I apply the credit-as-true rule and remand for an award of benefits. Reply at 10 [Dkt. No. 23]. There are three steps to the credit-as-true rule. First, courts ask whether "the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion." *Garrison*, 759 F.3d at 1020. Next, if the ALJ has erred, courts determine "whether the record has been fully developed, whether there are outstanding issues that must be resolved before a determination of disability can be made, and whether further administrative proceedings would be useful." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014) (internal quotation marks and citations omitted). Finally, if there are no outstanding issues and further proceedings would not be useful, courts may apply the credit as true rule and find the relevant testimony credible as a matter of law and determine whether the record, "taken as a whole, leaves not the slightest uncertainty as to the outcome of the proceeding." *Id.* (internal quotation marks omitted).

When evaluating whether the record has been fully developed, courts "consider whether

the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlements to benefits is clear under the applicable legal rules." *Id.* at 1103. "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate." *Id.* at 1101 (remanding where the record contained significant factual conflicts between plaintiff's testimony and objective medical evidence).

As noted above, the ALJ did not provide legally sufficient reasons for rejecting Jones's testimony and numerous medical source opinions. However, the record here has not been fully developed and a remand for an award of benefits would be improper. While the ALJ relied on an inaccurate characterization of Jones's activities of daily living to reject Jones's testimony and the opinions of Dr. Fentress, Dr. Kohbod, Dr. Khoi, and Dr. De Souza, there are factual issues to be resolved in the record, the most significant of which being the date on which Jones's limitations may have been disabling.

## CONCLUSION

For the foregoing reasons, I GRANT plaintiff's motion for summary judgment and DENY the government's motion. This matter is remanded to the SSA for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: September 24, 2019

William H. Orrick
United States District Judge